AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of Virginia



F I L E D

DEC - 6 2019

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>13109 PENNYPACKER LANE, FAIRFAX,<br>VIRGINIA 22033 (SUBJECT PREMISES #1) | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case No.   1:19-SW-1609

**UNDER SEAL**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1

located in the _____Eastern_____ District of _____Virginia_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), 843, and 846 | Distribution and Possession with Intent to Distribute, and Conspiracy to Distribute and Possess with Intent to Distribute, Controlled Substances |

The application is based on these facts:

See attached Affidavit

- ☐ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Reviewed by AUSA/SAUSA:

| AUSAs Jay Prabhu and Bibeane Metsch |
|---|

Special Agent Donald August Mockenhaupt, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date:   6 Dec 19

City and state: Alexandria, Virginia

_____ /s/ _____
Ivan D. Davis
United States Magistrate Judge

## ATTACHMENT A-1

*Property to be Searched*

The premises to be searched is the following, including any and all structures and/or vehicles located within the curtilage thereof: 13109 Pennypacker Lane, Fairfax, Virginia 22033, within the county of Fairfax. The nearest cross street is Pageant Lane. The property is a multi-level single family home. There is an overhang over the front door and the numbers "13109" are displayed horizontally on the overhang and above the front door. The overhang is supported by white pillars. The structure consists of yellow siding and it has white window frames with brown shutters. The driveway is to the left of the front door but there is no garage at the end of the driveway.



## **ATTACHMENT B**

*Property to be Seized*

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 21, United States Code, Sections 841, 843 and 846 (distribution and possession with intent to distribute, and conspiracy to distribute and possess with intent to distribute, controlled substances, including by means of the Internet, and illegal use of the mail):

     a.   Controlled substances, in particular Adderall and methamphetamine;

     b.   Items commonly associated with the packaging and sales of controlled substances, including USPS packaging, sealed parcels prepared for mailing, gray and manila bubble mailers, address labels, black foil bags, raisin boxes, plastic bags or zip lock bags;

     c.   Photographs and/or video, in particular photographs and/or videotapes of potential co-conspirators and their criminal associates, assets, and/or controlled substances, along with personal address lists, and other documents with the names and telephone numbers of potential co-conspirators;

     d.   Records, correspondence, narcotic customers lists, narcotic suppliers lists, ledgers, logs, journals, accounts payable and receivable, pay-owe sheets, contracts, letters and memoranda of agreements between potential coconspirators, formulas, receipts, phone records, phone books, address books, notations and other papers, and any files relating to the transporting, ordering, purchasing, or distributing of controlled substances;

     e.   Records relating to the use of and accumulation of proceeds derived from the sale of Adderall and methamphetamine or any other illegal controlled substances, as well as the acquisition of property obtained from drug proceeds, and items evidencing the obtaining, secreting, transfer, concealment, and/or expenditure of money obtained from drug sales, including records of large purchases, receipts, canceled checks, bank records, credit card records, wire transfers, wire transfer receipts, cashier's checks, cashier's check receipts, addressed mail, express delivery receipts/envelopes, utility company receipts, rent receipts, income tax returns, money drafts, money orders, and their receipts;

     f.   Financial records including expenses incurred in obtaining the equipment and items necessary for the transportation and/or distribution of controlled substances, income derived from the sales of controlled substances, as well as records of legitimate income or lack thereof, and general living expenses;

     g.   United States currency in excess of $1,000, cryptocurrency also known as virtual currency, including bitcoin, stored on electronic or paper wallets or other means, cryptocurrency private keys and recovery seeds, gift cards, cash cards, and records relating to income derived from the transportation, sales, and distribution of controlled

substances and expenditures of money and wealth, for example, money orders, wire transfers, cashier's checks and receipts, passbooks, checkbooks, check registers, securities, precious metals, jewelry, antique or modern automobiles, bank statements and other financial instruments, including stocks or bonds in amounts indicative of the proceeds of illicit controlled substances trafficking;

h.   Documents indicating travel in interstate and foreign commerce, such as travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills;

i.   Receipts, notes, ledgers, records, programs, and applications relating to Bitcoin and other cryptocurrencies;

j.   Records reflecting names, addresses, telephone numbers, internet monikers, and other contact or identification data for others involved in the exchange of bitcoin and other cryptocurrencies;

k.   Any digital device used to facilitate the above listed violations and forensic copies thereof;

l.   With respect to any digital device used to facilitate the above-listed violations or containing evidence falling within the scope of the categories of items to be seized described herein:

    i.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

    ii.    evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    iii.    evidence of the use of virtual private networks and the TOR network including, but not limited to, access of darknet marketplaces;

    iv.    evidence of the attachment of other devices;

    v.    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

    vi.    evidence of the times the device was used;

    vii.    passwords, encryption keys, PGP keys, recovery seeds, and other access devices that may be necessary to access devices;

viii.    applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

ix.    records of or information about Internet Protocol addresses used by the device; and

x.    records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

m.  Any and all cryptocurrency, to include the following:

i.    any and all representations of cryptocurrency public keys or addresses, whether in electronic or physical format;

ii.    any and all representations of cryptocurrency private keys, whether in electronic or physical format;

iii.    any and all representations of cryptocurrency wallets or their constitutive parts, whether in electronic or physical format, to include "recovery seeds" or "root keys" which may be used to regenerate a wallet.

n.  The United States is authorized to seize any and all cryptocurrency by transferring the full account balance in each wallet to a public cryptocurrency address controlled by the United States.

n.  The United States is further authorized to copy any wallet files and restore them onto computers controlled by the United States. By restoring the wallets on its own computers, the United States will continue to collect cryptocurrency transferred into the wallets seized as a result of transactions that were not yet completed at the time that the devices were seized.

2.  As used herein, the terms "records," "documents," "programs," "applications," "materials," and "information" include all forms of creation or storage, including in digital form on any digital device and any forensic copies thereof as well as any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

3.  As used herein, the term "computer" is an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in

conjunction with such device. *See* 18 U.S.C. § 1030(e)(1). Computers are physical units of equipment that perform information processing using a binary system to represent information. Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

4.   As used herein, the term "storage medium" includes any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices. Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

5.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

6.   For any computer or storage medium whose seizure is otherwise authorized by the search warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a.   evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.   evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.   evidence of the lack of such malicious software;

d.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

e.   evidence of the use of virtual private networks and the TOR network including, but not limited to, access of darknet marketplaces;

f. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

g. evidence indicating the computer user's state of mind as it relates to the crime under investigation;

h. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

i. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

j. evidence of the times the COMPUTER was used;

k. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

l. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

m. records of or information about Internet Protocol addresses used by the COMPUTER;

n. records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

o. Routers, modems, and network equipment used to connect COMPUTERs to the Internet; and

p. contextual information necessary to understand the evidence described in this Attachment B.

7. During the execution of the search of the **SUBJECT PROPERTIES** described in Attachments A-1, A-2, and A-3, law enforcement personnel are authorized to press the fingers (including thumbs) of individuals found at the **SUBJECT PROPERTIES** to the Touch ID sensor of any Apple brand device(s), such as an iPhone or iPad, found at the **SUBJECT PROPERTIES** and to hold the digital devices found at the **SUBJECT PROPERTIES** in front of the face of individuals found at or in the **SUBJECT PROPERTIES** with the individuals' eyes open to activate the facial-, iris-, and/or retina-recognition features for the purpose of attempting to unlock the device via Touch ID, Face ID or similar biometric features in order to search the contents as authorized by this warrant.

8. The search warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate

evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

9. Any locked container such as a safe may be searched for the property to be seized set forth herein;

10. If the government identifies seized communications to/from an attorney, the investigative team will discontinue review until a filter team of government attorneys and agents is established. The filter team will have no previous or future involvement in the investigation of this matter. The filter team will review all seized communications and segregate communications to/from attorneys, which may or may not be subject to attorney-client privilege. At no time will the filter team advise the investigative team of the substance of any of the communications to/from attorneys. The filter team then will provide all communications that do *not* involve an attorney to the investigative team and the investigative team may resume its review. If the filter team decides that any of the communications to/from attorneys are not actually privileged (*e.g.,* the communication includes a third party or the crime-fraud exception applies), the filter team must obtain a court order before providing these attorney communications to the investigative team. This investigation is presently covert and the government believes that the subject(s) of the search is not aware of this warrant.

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA



Alexandria Division

IN THE MATTER OF THE SEARCH OF:

13109 PENNYPACKER LANE, FAIRFAX,
VIRGINIA 22033 (**SUBJECT PREMISES
#1**);

13514 TABSCOTT DRIVE, CHANTILLY,
VIRGINIA 20151 (**SUBJECT PREMISES
#2**);

AND

GRAY 2014 MERCEDES BENZ CLA 250
WITH VIRGINIA LICENSE PLATE
NUMBER VRP9225, VIN
# WDDSJ4EB7EN124502 (**SUBJECT
VEHICLE**)

Case Nos. 1:19-SW-1609;
1:19-SW-1610;
1:19-SW-1611

**UNDER SEAL**

### AFFIDAVIT IN SUPPORT OF APPLICATIONS FOR SEARCH WARRANTS

I, Donald August Mockenhaupt, being duly sworn, depose and state as follows:

### Agent Background

1.      I am a duly appointed Special Agent of the Federal Bureau of Investigation ("FBI")

and have been employed as such since February 2002.  I am currently assigned to the Washington

(D.C.) Field Office, Northern Virginia Resident Agency.  I am on a squad that investigates darknet

related narcotics trafficking and I have been assigned to this squad since February 2019.  Since

August 2004, the vast majority of my investigative assignments have been narcotics related cases.

2.      As a FBI Special Agent, I have received extensive training in the enforcement of

the criminal laws of the United States, as well as extensive training in criminal investigations.  I

have also participated in numerous investigations involving unlawful narcotics distribution.

During my participation in these investigations, I have been involved in the application for and execution of many arrest and search warrants for narcotics related offenses, resulting in the prosecution and conviction of numerous individuals and the seizure of illegal drugs, illegal drug proceeds, and other evidence of criminal activity. As a narcotics investigator, I have interviewed many individuals involved in drug trafficking and have obtained information from them regarding the acquisition, sale, importation, manufacture, and distribution of controlled substances. Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology utilized by traffickers of controlled dangerous substances.

3.     I am submitting this affidavit in support of applications for search warrants for the following property, collectively hereinafter referred to as the "**SUBJECT PROPERTIES**":

(a) the residence of 13109 Pennypacker Lane, Fairfax, Virginia 22033 as described in detail in Attachment A-1 (hereinafter referred to as "**SUBJECT PREMISES #1**"). Based on a review of Fairfax County property records online, **SUBJECT PREMISES #1** is owned by Tyler PHAM. Based on physical surveillance and a review of Virginia DMV license records, Tyler PHAM and LIEN KIM THI PHAN who is believed to be his wife reside at **SUBECT PREMISES #1** with their minor children;

(b) the residence of 13514 Tabscott Drive, Chantilly, Virginia 20151 as described in detail in Attachment A-2 (hereinafter referred to as "**SUBJECT PREMISES #2**"). Based on a review of Fairfax County property records online, **SUBJECT PREMISES #2** is owned by an individual who is believed to be the father of HON LAM LUK. Based on physical surveillance and a review of Virginia DMV license records, HON LAM LUK and his wife DUONG THUY

2

NGUYEN reside at **SUBJECT PREMISES #2** along with their minor child

and an individual believed to be HON LAM LUK's father; and

(c) a 2014 gray Mercedes Benz CLA 250 bearing Virginia license plate number

VRP9225 and vehicle identification number ("VIN") WDDSJ4EB7EN124502

described in detail in Attachment A-3 (referred to hereinafter as the "**SUBJECT**

**VEHICLE**"). The **SUBJECT VEHICLE** is registered to HON LAM LUK

and an individual believed to be his father at **SUBJECT PERMISES #2.**

4.      Based on my training and experience, I am aware that:

a.      Individuals who distribute illegal controlled substances often maintain

records relative to their drug trafficking activities. These records and documents are usually

secreted in their places of residence, or the residences of family members, friends, or associates,

in their businesses, or in the places of operation of the drug distribution activity such as a stash

house or safe house. These documents often include ledgers, account books, calculations, or other

notations which reflect inventories and quantities of narcotics purchased and distributed. The

documents also may include "pay-owe sheets," which are documents that bear calculations,

customers' names, quantities, and prices.

b.      Individuals who distribute illegal controlled substances maintain

documents, letters, and records relating to the illegal activity for periods of time. This documentary

evidence is usually secreted in their places of residence, or the residences of family members,

friends, or associates, in their businesses, or in the places of operation of the drug distribution

activity such as a stash house or safe house. This documentary evidence includes, but is not limited

to, telephone numbers, telephone books, address books, credit card receipts, hotel receipts, train

and bus tickets, car rental receipts, amounts and records in fictitious names, false identification

documents, money orders, account notations, "pay-owe sheets," and other records indicating the existence of storage facilities used in narcotics trafficking. In my training and experience, I also know that individuals who have committed crimes using computers, often keep records of their crimes in digital or electronic format, such as on a computer, and that computers are often stored in a residence.

c.    Individuals who distribute illegal controlled substances attempt to legitimize the proceeds from the sale of controlled substances. They often accomplish this by using the services of banks, various financial institutions, and real estate brokers. Books and papers relating to such efforts, including but not limited to, cashier checks, money orders, telegrams, letters of credit and ledgers, are often maintained in the residence and on the property of the drug trafficker.

d.    Individuals who distribute illegal controlled substances on the darknet often use and are paid in virtual currency which also known as cryptocurrency. Virtual currency could be stored almost anywhere within a residence, in both physical and electronic formats. For example, Attachment B lists items to be seized including bitcoin,[1] Bitcoin wallets, Bitcoin keys, and passwords. These pieces of data comprise long and complex character strings, and in my training and experience I know that many virtual currency users write down or otherwise record and store such items because they are too long to commit to memory. As such, these items evidencing the use of virtual currency, specifically wallets, keys, and passwords may be

---

[1] Since Bitcoin is both a currency and a protocol, capitalization differs. Accepted practice is to use "Bitcoin" (singular with an uppercase letter B) to label the protocol, software, and community, and "bitcoin" (with a lowercase letter b) to label units of the currency. That practice is adopted here.

documented in writing and secreted anywhere within a residence. Therefore, individuals typically keep such records, data, and documents in their residence, including in computers or on other devices that store electronic data.

        d.      Individuals who distribute illegal controlled substances commonly maintain addresses or telephone numbers in books or papers, which reflect names, addresses and/or telephone numbers of their associates in drug trafficking. They also store such information, as well as photographs, messages, and personal notes, in electronic equipment including, but not limited to, computers, cellular phones, and other electronic software and mediums.

        .e.      Individuals who distribute illegal controlled substances often maintain, on hand and in their residences, large amounts of United States currency in order to maintain and finance their ongoing criminal activities.

        f.      Individuals who distribute illegal controlled substances commonly maintain currency, controlled substances, firearms, and other contraband in locked containers such as a safe.

        g.      Individuals who distribute illegal controlled substances take, or cause to be taken, photographs of themselves and their associates in the drug trade, property derived from the distribution of narcotics, and their products, and such photographs are often kept in their residence. Individuals who distribute illegal controlled substances commonly keep packaging materials, scales, and other drug paraphernalia in their residences and on their property.

        5.      This affidavit does not contain every fact known to me regarding this investigation, but rather contains information necessary to demonstrate probable cause in support of the applications for search warrants for the **SUBJECT PROPERTIES**. All information contained in this affidavit is either personally known to me, has been related to me by other law enforcement

officers, or has been related to me by reports, or records and documents gathered during this investigation.

**Initiation of Investigation**

6.      The United States, including the FBI, the U.S. Postal Inspection Service ("USPIS"), the Fairfax County Police Department, the Drug Enforcement Administration, and the Food and Drug Administration Office of Criminal Investigations, is conducting a criminal investigation of a darknet market ("DM") vendor that operates using the moniker "addy4cheap." A DM is a hidden commercial website that operates on a portion of the Internet that is often referred to as the TOR network, darkweb, or darknet. A DM operates as a black market, selling or brokering transactions involving legal products as well as drugs, weapons, counterfeit currency, stolen credit card details, forged documents, unlicensed pharmaceuticals, steroids, and other illicit goods.

7.      In August 2019, Darknet Opioid Task Force FBI agents interviewed an individual residing in Fairfax County, Virginia within the Eastern District of Virginia who was suspected of being a darknet drug recipient. The individual is referred to herein in the masculine, regardless of true gender. The individual stated that he had on multiple occasions purchased Adderall through a DM known as the Empire Market from a vendor using the moniker addy4cheap. He did not think that the pills that he received were pharmaceutical grade as he had a prescription for Adderall and the tablets from addy4cheap were different from those that he had been prescribed. The individual stated that he received the tablets via U.S. Mail and that the return address on the packages from addy4cheap was in Fairfax, Virginia. The individual provided agents with the tracking number from his most recent purchase from addy4cheap on the Empire Market.

8.      A review of U.S. Postal Service ("USPS") business records indicated that the aforementioned individual had received three packages that were consistent with his description

6

of the packages that he stated he had received from addy4cheap. All three parcels were shipped via USPS First Class Mail, contained tracking numbers, and bore the sender name "TXPRESS" with a return address in Fairfax County, Virginia. The records also indicated that at least one of the packages mailed to the individual was deposited at an external blue USPS collection box at the Chantilly Post Office in Chantilly, Virginia (hereinafter referred to as the "Chantilly Collection Box"), located within the Eastern District of Virginia.

### Addy4cheap's Vendor Accounts

9.     During the course of this investigation, investigators reviewed darknet marketplaces and observed vendor accounts with the moniker addy4cheap offering drugs for sale on the Empire Market and Cryptonia. On both of these DMs, the vendor using the addy4cheap moniker advertised the sale of Adderall. Addy4cheap offered Adderall for sale on the Empire Market and Cryptonia for quantities ranging from one to over 1000 tablets. The price for one tablet was listed at $12 with the price per tablet decreasing if you purchase more. Addy4cheap scaled the prices such that the price per tablet is $8 if you purchase 1,000 tablets or more.

10.     Customers on the Empire Market have the ability, but are not required, to leave a review of any product that they purchase on the relevant vendor's profile. As of December 4, 2019, the vendor using the moniker addy4cheap on the Empire Market had 2,558 reviews which consisted of 2,512 positive reviews, 25 neutral reviews, and 21 negative reviews. As an investigator, this indicates to me that the vendor using the addy4cheap moniker has fulfilled at least 2,558 orders through the Empire Market. It is noted that the Empire Market lists addy4cheap as becoming a member of the DM on May 24, 2019. Therefore, between May 24, 2019 and December 4, 2019, addy4cheap appears to have executed at least 2,558 reviewed transactions. I suspect that the actual number of transactions for the sale of illegal narcotics by addy4cheap on

7

the Empire Market exceeds 2,558 because customers are not required to leave a review. I also

observed several negative reviews left for the vendor addy4cheap on the Empire Market. Some

examples of the negative reviews are as follows: (1) "Tested positive for meth with simon a/b test",

(2) "Not Adderall. Pressed pills. Tested positive for meth", (3) "Dishonest vendor. Says its

authentic adderall and sends meth and sugar pressed into an "adderall" shape. Took this to study

and ended up not sleeping for two days. It sucked. Do not buy", and (4) "I tested the pills and they

contain Meth. I was pretty upset since he advertised them as 100% authentic. I messaged him and

he said the most he could offer me was a 15% discount. Just beware buyer these are Meth pills!"

11.    On November 7, 2019, I reviewed the addy4cheap vendor profile on Cryptonia.

The profile indicated that addy4cheap had conducted 140 transactions and has been a member of

the DM since June 29, 2019. I also reviewed the language in the terms and conditions and the

refunds and dispute sections of the addy4cheap profile. That language was identical on

addy4cheap's profile on both the Empire Market and Cryptonia.

### Undercover Drug Purchases from Addy4cheap

12.    Beginning in late August 2019, investigators began to conduct undercover drug

purchases from addy4cheap via the Empire Market. Later in the investigation, investigators made

undercover purchases from addy4cheap on Cryptonia as well. To initiate the transactions, the

investigators logged into their undercover account on the Empire Market or Cryptonia and placed

their orders with addy4cheap. The undercover investigators paid for the suspected narcotics with

virtual currency, specifically bitcoin, obtained with official government funds. The suspected

narcotics were then sent to the investigators via First Class Mail and the tablets were received

several days after the undercover investigator ordered them. The below table lists the undercover

purchases from addy4cheap. The table denotes the following: (1) the date that the undercover

purchase was initiated, (2) the DM utilized by the undercover investigators, (3) the number of tablets ordered in that specific transaction, (4) the address of the general area of where the undercover investigator designated the drugs to be shipped to and (5) the return name on the envelope. The return name is also commonly referred to as the sender's name.

| Date Ordered | DM | Number of Tablets | Location Mailed To | Return Name on Envelope |
|---|---|---|---|---|
| 8/24/2019 | Empire | 11 | Fairfax County, VA | TXPRESS |
| 8/28/2019 | Empire | 20 | Prince William County, VA | TXPRESS |
| 9/1/2019 | Empire | 10 | Fairfax County, VA | TRX Express |
| 9/5/2019 | Empire | 16 | Prince William County, VA | TRX Express |
| 9/12/2019 | Cryptonia | 20 | Loudoun County, VA | TRX Express |
| 9/23/2019 | Cryptonia | 40 | Loudoun County, VA | SMART BARGAIN |
| 9/24/2019 | Empire | 10 | Fairfax County, VA | TRX Express |
| 9/30/2019 | Empire | 20 | Prince William County, VA | TRX Express |
| 10/1/2019 | Cryptonia | 20 | Providence, RI | TRX Express |
| N/A[2] | Cryptonia | 20 | Providence, RI | TRX Express |
| 10/9/2019 | Empire | 30 | Anne Arundel County, MD | JUNGLE CO |
| 10/15/2019 | Empire | 200 | Prince William County, VA | RAISON EXPRESS |
| 10/21/2019 | Cryptonia | 20 | Providence, RI | RAISON EXPRESS |
| 10/22/2019 | Cryptonia | 20 | Loudoun County, VA | RAISON EXPRESS |

[2] It is noted that there is no ordered date listed for one of the undercover drug purchases. The undercover investigator ordered 20 tablets on October 1, 2019 and asked for the tablets to be mailed to a Providence, Rhode Island address. The shipment arrived and a second package was mailed shortly thereafter with the same quantity of tablets. Investigators believe that this was a mistake made by addy4cheap because there was no payment for this second package.

| Date Ordered | DM | Number of Tablets | Location Mailed To | Return Name on Envelope |
|---|---|---|---|---|
| 10/29/2019 | Cryptonia | 100 | Loudoun County, VA | RAISON EXPRESS |
| 11/5/2019 | Empire | Ordered 20, Received 24 | Prince William County, VA | RAISON EXPRESS |
| 11/6/2019 | Cryptonia | 20 | Prince William County, VA | RAISON EXPRESS |
| 11/12/2019 | Cryptonia | 20 | Prince William County, VA | RAISON EXPRESS |
| 11/19/2019 | Empire | 100 | Prince William County, VA | RAISON EXPRESS |
| 11/21/2019 | Empire | 19 | Prince William County, VA | RAISON EXPRESS |

13.     All of the aforementioned tablets received from addy4cheap are peach in color and resemble those advertised on addy4cheap's vendor pages on the Empire Market and Cryptonia. Consistent with the advertisements by addy4cheap on the Empire Market and Cryptonia, upon visual inspection, investigators observed markings on the tablets of "A D" and "30" which is consistent with known markings for 30 milligram Adderall tablets, however, the purchased tablets appeared to be pressed.  Tablets that are pressed are not produced by pharmaceutical companies, rather they are produced by black market drug traffickers.

14.     All of the aforementioned tablets were shipped in padded envelopes via U.S. Mail, the method of shipment available through addy4cheap.  The padded envelopes were manila or light gray.  The return names and addresses on the packages changed throughout the investigation, but all of the return addresses were locations in Fairfax County, Virginia.   Most of the packages contained one or two folded pieces of paper and a sealed black foil bag.  Within the black foil bag was a clear re-sealable bag which contained the tablets.  Three of the packages from "RAISON EXPRESS" contained empty raisin boxes where the tablets were inside clear re-sealable bags

10

within the raisin boxes. I know that individuals involved in selling drugs via the darknet try to disguise their drug shipments in order to avoid detection by law enforcement.

15. Some of the tablets ordered on August 24, 2019 were subsequently analyzed at the Commonwealth of Virginia Department of Forensic Science and it was determined that the tablets contained methamphetamine, a Schedule II controlled substance. The remaining tablets are pending laboratory analysis. Tablets ordered on September 12, 2019 and October 29, 2019, field tested positive for the presence of methamphetamine. Investigators weighed the tablets upon receipt and each individual tablet received through the undercover buys weighed approximately 0.35 grams. The total number of tablets obtained from undercover purchases was 740 for an estimated total of 259 grams.

16. The controlled purchases described above involving the addy4cheap moniker were conducted using Bitcoin, a type of digital cryptocurrency. Functionally, it serves the same purpose as United States dollars, except that it is not tied to a central bank and is not regulated by a government body such as a treasury. Bitcoin transactions take place entirely online and offer a degree of anonymity to users. Bitcoin transactions are securely recorded in a public ledger called a blockchain. Based on my training and experience, individuals who are involved in criminal activity over the darkweb often purchase items in Bitcoin to conceal the true nature of the funds from law enforcement.

## Surveillance of LIEN KIM THI PHAN

17. On August 28, 2019, a surveillance camera recorded a white Scion as it approached the Chantilly Collection Box and I have reviewed the video recording. The recording shows the white Scion park next to the Chantilly Collection Box and the driver's side front door opened slightly. The driver then placed multiple manila envelopes into the Chantilly Collection Box. I

could not observe who operated the vehicle. The vehicle then departed from the post office. I queried the Virginia Department of Motor Vehicles ("DMV") records for the license plate on the white Scion and observed that it is registered to Tyler PHAM at 13109 Pennypacker Lane, Fairfax, Virginia 22033 (**SUBJECT PREMISES #1**). Further investigation has revealed that Tyler PHAM and LIEN KIM THI PHAN are likely husband and wife.

18.    On August 30, 2019, law enforcement identified a USPS Priority Mail parcel shipped from Plano, Texas scheduled for delivery at **SUBJECT PREMISES #1** on August 31, 2019. The parcel contained a handwritten label addressed to "HoN LUCK"[3] with a return address of Garland, Texas. Further analysis of USPS records for previous mailings to **SUBJECT PREMISES #1** from Texas between April 11, 2019 and August 21, 2019 revealed 17 total parcels sent, nine of which were addressed to "Hon Luck."

19.    On September 3, 2019, investigators conducted physical surveillance in the vicinity of **SUBJECT PREMISES #1**. The white Scion was observed parked in the driveway as was a gray Honda Pilot. Based on Virginia DMV records at that time, the Honda was registered to LIEN KIM THI PHAN at **SUBJECT PREMISES #1**.

20.    On September 3, 2019, investigators observed LIEN KIM THI PHAN depart **SUBJECT PREMISES #1** in the white Scion. Surveillance units followed LIEN KIM THI PHAN to the Greenbriar Town Center located a short distance from **SUBJECT PREMISES #1**. LIEN KIM THI PHAN exited the white Scion and she carried a bag a USPS collection box located in the Greenbriar Town Center in Fairfax, Virginia located in front of some retail shops (hereinafter referred to as the "Greenbriar Collection Box"). LIEN KIM THI PHAN then took multiple manila

---

[3] This spelling is how the name appeared on the label as written.

envelopes out of the bag and deposited them into the Greenbriar Collection Box. LIEN KIM THI PHAN was then followed to the aforementioned Chantilly Post Office where she deposited additional manila envelopes with white labels into the blue Chantilly Collection Box.

21.     On September 3, 2019, a U.S. Postal Inspector reviewed USPS records for 40 packages that had been deposited into the Greenbriar Collection Box and the Chantilly Collection Box. The 40 packages were all in the same type of padded manila envelopes and they all had the same return address information. The name listed on the return address was "TXPRESS" and the address was a location in Fairfax County, Virginia. Therefore, I believe that the 40 packages reviewed by USPIS were likely the same manila envelopes that investigators observed LIEN KIM THI PHAN deposit into the Greenbriar Collection Box and the Chantilly Collection Box earlier on September 3, 2019.

22.     On September 11, 2019, investigators conducted physical surveillance in the vicinity of **SUBJECT PREMISES #1**. The white Scion was observed parked in the driveway along with the Honda Pilot. Shortly thereafter, investigators followed the white Scion operated by LIEN KIM THI PHAN from Pennypacker Lane to the Greenbriar Town Center located a short distance away. LIEN KIM THI PHAN carried a bag to the Greenbriar Collection Box located in front of some retail shops. LIEN KIM THI PHAN then took multiple manila envelopes with white labels out of the bag and deposited them into the Greenbriar Collection Box. Approximately 12 minutes later, LIEN KIM THI PHAN was observed at the Chantilly Post Office where she deposited additional manila envelopes with white labels into the Chantilly Collection Box.

23.     On September 11, 2019, a U.S. Postal Service Inspector reviewed USPS records for 17 packages that had been deposited into the Greenbriar Collection Box and 24 packages that had been deposited into the Chantilly Collection Box. The 41 packages were all in the same type

of padded manila envelopes and they all had the same return address information. The name on the return address was "TRX EXPRESS" and the address was a location in Fairfax County, Virginia. Therefore, I believe that the 41 packages reviewed by USPIS were likely the same manila envelopes that LIEN KIM THI PHAN deposited into the Greenbriar Collection Box and the Chantilly Collection Box earlier on September 11, 2019.

24.     Additionally on September 11, 2019, a U.S. Postal Inspector reviewed USPS records for 13 padded manila packages that bore a return name of "TRX EXPRESS" and a Fairfax County, Virginia return address. These 13 packages had been deposited in a USPS collection box in Loudoun County, Virginia. The parcel characteristics for these 13 packages were the exact same as those retrieved from the Greenbriar Collection Box and the Chantilly Collection Box.

25.     On September 17, 2019, investigators observed the white Scion and the Honda Pilot parked in the driveway of **SUBJECT PREMISES #1.**  Later on that day, investigators observed the white Scion arrive in the parking lot in the vicinity of the Greenbriar Collection Box in the Greenbriar Town Center. Investigators observed LIEN KIM THI PHAN deposit multiple manila envelopes into the blue Greenbriar Collection Box. Shortly thereafter, the white Scion was observed at the Chantilly Post Office. Investigators observed LIEN KIM THI PHAN deposit several manila envelopes with white labels into the Chantilly Collection Box. Shortly thereafter, the white Scion was observed at Lafayette Center Drive in Fairfax County in the vicinity of a USPS collection box (hereinafter referred to as the "Lafayette Center Drive Collection Box"). Investigators observed LIEN KIM THI PHAN approach the collection box and deposit additional manila envelopes with white labels. In total, LIEN KIM THI PHAN was observed depositing manila envelopes at three different collection boxes, to include at a Post Office, within approximately one hour and six minutes.

14

26.    Additionally on September 17, 2019, a U.S. Postal Inspector reviewed USPS records for 80 padded manila packages that bore a return name of "TRX EXPRESS" and a Fairfax County, Virginia return address. The records for the 80 packages indicated that they were deposited into the three aforementioned USPS collection boxes that LIEN KIM THI PHAN was observed depositing manila envelopes into on September 17, 2019 along with an additional USPS collection box in Fairfax County, Virginia. Investigators did not observe LIEN KIM THI PHAN deposit packages into the additional collection box in Fairfax County. Therefore, I believe that the packages reviewed by USPIS were likely the same manila envelopes that investigators observed LIEN KIM THI PHAN deposit into three collection boxes earlier on September 17, 2019 plus another quantity deposited at the additional collection box where no physical observations were made.

27.    On September 19, 2019, investigators observed the white Scion travel from **SUBJECT PREMISES #1** to a shopping plaza in Loudoun County, Virginia. Investigators observed LIEN KIM THI PHAN deposit multiple manila envelopes into a blue USPS collection box in that shopping plaza (referred to hereinafter as the "Loudoun County Collection Box").

28.    Additionally on September 19, 2019, a U.S. Postal Inspector reviewed USPS records for 57 padded manila packages that bore a return name of "TRX EXPRESS" and a Fairfax County, Virginia return address. These records were for packages that had been deposited in the aforementioned Loudoun County Collection Box that LIEN KIM THI PHAN was observed depositing manila envelopes into on September 19, 2019 along with an additional amount at the Chantilly Post Office. Specifically, the records indicate that 20 packages were deposited into the Loudoun County Collection Box and 37 packages were deposited into the Chantilly Collection Box. Investigators reviewed a video surveillance recording stationed at the Chantilly Post Office.

15

The recording showed the gray Honda Pilot arrive at the Chantilly Post Office at approximately 4:11 p.m. and the driver deposited multiple manila envelopes into the Chantilly Collection Box. Therefore, I believe that the 20 packages reviewed by USPIS were likely the same manila envelopes that investigators observed LIEN KIM THI PHAN deposit into the collection box in Loudoun County and an unknown individual deposited the 37 packages into the Chantilly Collection Box.

29.     In the early morning hours of September 22, 2019, investigators conducted surveillance in the area of **SUBJECT PREMISES # 1**. Investigators observed several large cardboard boxes on the curb in front of **SUBJECT PREMISES # 1**. Later in the afternoon on September 22, 2019, I conducted a drive-by surveillance of **SUBJECT PREMISES # 1** and saw that one of the large cardboard boxes had the words "Executive Gun Safe" on it.

30.     During the early morning hours of September 23, 2019, a GPS tracking device was installed on the white Scion pursuant to a tracking warrant issued by United States Magistrate Judge Theresa Carroll Buchanan on September 20, 2019. The tracking device was removed on November 1, 2019.

31.     On September 24, 2019, investigators conducted physical surveillance in the vicinity of **SUBJECT PREMISES #1**. The white Scion was observed parked in the driveway along with the Honda Pilot. Later in the morning, the white Scion traveled to the Lafayette Center Drive Collection Box in Fairfax County. LIEN KIM THI PHAN was observed carrying a yellow and blue bag up to the collection box and she deposited multiple manila envelopes with white labels. Approximately ten minutes later, LIEN KIM THI PHAN was observed at a USPS collection box in Loudoun County, Virginia. LIEN KIM THI PHAN carried the same yellow and blue bag up to the collection box and she deposited multiple manila envelopes with white labels.

32.     Additionally on September 24, 2019, a U.S. Postal Inspector reviewed USPS records for 39 padded manila packages that bore a return name of "TRX EXPRESS" and a Fairfax County, Virginia return address that had been deposited in the two aforementioned USPS collection boxes that LIEN KIM THI PHAN was observed depositing manila envelopes into on September 24, 2019. Specifically, there were 18 deposited at the Lafayette Center Drive Collection Box and 21 at the collection box in Loudoun County, Virginia. Therefore, I believe that the 39 packages reviewed by USPIS were likely the same manila envelopes that investigators observed LIEN KIM THI PHAN deposit into collection boxes earlier on September 24, 2019.

33.     During the evening hours of September 24, 2019, investigators spoke with a law enforcement team assigned to Ronald Reagan Washington National Airport. As part of passenger screening, it was discovered that Tyler PHAM, who lives at **SUBJECT PREMISES #1** with LIEN KIM THI PHAN, was carrying over $30,000 in U.S. Currency. A drug detecting K-9 alerted to the money carried by PHAM and the money was seized by law enforcement.

34.     I reviewed the data collected from the GPS device that was installed on the white Scion for the early morning hours of September 26, 2019. I observed that the white Scion traveled shortly after 3:00 AM to the vicinity of 13514 Tabscott Drive, Chantilly, Virginia (**SUBJECT PREMISES #2**) where HON LAM LUK and DUONG THUY NGUYEN reside. The data indicated that the white Scion was in the vicinity of the residence for less than ten minutes before the white Scion returned to the immediate vicinity of the Pennypacker Lane address.

### Surveillance of HON LAM LUK and the SUBJECT VEHICLE

35.     I reviewed airline records from Korean Air pertaining to HON LAM LUK. The records indicated that HON LAM LUK departed the U.S. on August 26, 2019 for Vietnam and he arrived back in the U.S. on September 19, 2019.

17

36.     On September 26, 2019, the same day that the white Scion traveled shortly after 3:00 AM to the area near **SUBJECT PREMISES #2** for less than ten minutes before returning to the immediate vicinity of the Pennypacker Lane address, investigators reviewed video surveillance recordings from the area near the Chantilly Collection Box.   At approximately 10:19 AM, investigators observed the **SUBJECT VEHICLE** park alongside the Chantilly Collection Box into which the driver deposited numerous manila envelopes.  Investigators queried the license plate of the **SUBJECT VEHICLE** with the Virginia Department of Motor Vehicles and observed that it is registered to HON LAM LUK and an individual believed to be his father at **SUBJECT PREMISES #2.**

37.     On September 27, 2019, investigators observed the **SUBJECT VEHICLE** drive past the Chantilly Post Office and disappear from view.  Several minutes later, the **SUBJECT VEHICLE** pulled alongside the Chantilly Collection Box and deposited multiple manila envelopes.  The driver of the **SUBJECT VEHICLE** was identified as HON LAM LUK, one of the registered owners of the vehicle who lives at **SUBJECT PREMISES #2.**  A USPS clerk emptied the box shortly thereafter and investigators observed 19 manila padded envelopes in the box with the sender name of "TRX EXPRESS" and a return address in Fairfax County, Virginia. Additionally, one of the 19 packages was intended for the undercover investigator who had placed an order on September 24, 2019 with addy4cheap as detailed in the table above.

38.     On September 30, 2019, investigators observed the **SUBJECT VEHICLE** drive past the Chantilly Post Office and disappear from view.  Several minutes later, the **SUBJECT VEHICLE** pulled alongside the Chantilly Collection Box and HON LAM LUK deposited multiple manila envelopes into the Chantilly Collection Box.

18

39.     Additionally on September 30, 2019, a U.S. Postal Inspector reviewed USPS records for 25 padded manila packages that bore a return name of "TRX EXPRESS" and a Fairfax County, Virginia return address. These 25 packages had been deposited in the Chantilly Collection Box on September 30, 2019, which is the same Chantilly Collection Box where investigators observed HON LAM LUK deposit manila envelopes on September 30, 2019. Therefore, I believe that the 25 packages reviewed by USPIS were likely the same manila envelopes that investigators observed HON LAM LUK deposit earlier on September 30, 2019.

40.     On October 2, 2019, investigators observed the **SUBJECT VEHICLE** depart from **SUBJECT PREMISES #2**. Shortly thereafter, the **SUBJECT VEHICLE** pulled alongside the Chantilly Collection Box and HON LAM LUK deposited multiple manila envelopes.

41.     Additionally on October 2, 2019, a U.S. Postal Inspector reviewed USPS records for 28 padded manila packages that bore a return name of "TRX EXPRESS" and a Fairfax County, Virginia return address. These 28 packages had been deposited in the Chantilly Collection Box on October 2, 2019, which is the same Chantilly Collection Box where investigators observed HON LAM LUK deposit manila envelopes on October 2, 2019. Therefore, I believe that the 28 packages reviewed by USPIS were likely the same manila envelopes that investigators observed HON LAM LUK deposit earlier on October 2, 2019.

42.     On October 4, 2019, investigators observed the **SUBJECT VEHICLE** depart from **SUBJECT PREMISES #2** and investigators followed the **SUBJECT VEHICLE**. Shortly thereafter, the **SUBJECT VEHICLE** pulled alongside the Chantilly Collection Box and HON LAM LUK deposited multiple manila envelopes.

43.     Additionally on October 4, 2019, a U.S. Postal Inspector reviewed USPS records for 12 padded manila packages that bore a return name of "TRX EXPRESS" and a Fairfax County,

19

Virginia return address. These 12 packages had been deposited in the Chantilly Collection Box on October 4, 2019, which is the same Chantilly Collection Box where investigators observed HON LAM LUK deposit manila envelopes on October 4, 2019. Therefore, I believe that the 12 packages reviewed by USPIS were likely the same manila envelopes that investigators observed HON LAM LUK deposit earlier on October 4, 2019.

44.   On October 7, 2019, investigators observed the **SUBJECT VEHICLE** depart from **SUBJECT PREMISES #2**. Shortly thereafter, the **SUBJECT VEHICLE** pulled alongside the Chantilly Collection Box and HON LAM LUK appeared to deposit multiple manila envelopes with white labels into the Chantilly Collection Box. It appeared to investigators that HON LAM LUK had difficulty depositing items as it appeared that the collection box was full. An investigator observed additional USPS customers have the same issue when they tried to deposit their mail.

45.   Additionally on October 7, 2019, a U.S. Postal Inspector reviewed USPS records for one padded manila package that bore a return name of "TRX EXPRESS" and a Fairfax County, Virginia return address. The package had been deposited in the Chantilly Collection Box on October 7, 2019, which is the same Chantilly Collection Box where investigators observed HON LAM LUK deposit manila envelopes on October 7, 2019. Therefore, I believe that the package reviewed by USPIS was likely the same manila envelope that investigators observed HON LAM LUK deposit earlier on October 4, 2019.

46.   On October 8, 2019, investigators observed the **SUBJECT VEHICLE** parked at **SUBJECT PREMISES #2**. Shortly thereafter, the **SUBJECT VEHICLE** was observed driving toward the Chantilly Post Office. The **SUBJECT VEHICLE** then pulled alongside the Chantilly Collection Box and HON LAM LUK deposited multiple manila envelopes with white envelopes. Based on a review of surveillance photos, investigators believed that HON LAM LUK had some

20

type of covering at the end of his left index finger. Investigators believe that HON LAM LUK utilized the covering in order to avoid leaving fingerprints on the envelopes.

47. Additionally on October 8, 2019, a U.S. Postal Inspector reviewed USPS records for 22 padded manila packages that bore a return name of "TRX EXPRESS" with a Fairfax County, Virginia return address. These 22 packages had been deposited into the Chantilly Collection Box on October 8, 2019, which is the same Chantilly Collection Box where investigators observed HON LAM LUK deposit manila envelopes on October 8, 2019. Therefore, I believe that the 22 packages reviewed by USPIS were likely the same manila envelopes that investigators observed HON LAM LUK deposit earlier on October 8, 2019.

48. During the late evening hours of October 15, 2019, a GPS tracking device was installed on the **SUBJECT VEHICLE** pursuant to a tracking warrant issued by United States Magistrate Judge Michael Nachmanoff on October 11, 2019.

49. I reviewed the data collected from the GPS device that was installed on the **SUBJECT VEHICLE** for October 17, 2019. At approximately 9:50 PM, the **SUBJECT VEHICLE** left **SUBJECT PREMISES #2** and was in the vicinity of **SUBJECT PREMISES #1** until approximately 10:02 PM. The **SUBJECT VEHICLE** then proceeded to the Franklin Farm Shopping Center near a USPS collection box arriving at approximately 10:12 PM. That same evening, at approximately 10:15 PM, HON LAM LUK was observed by an investigator driving the **SUBJECT VEHICLE** in the Franklin Farm Shopping Center.

50. On October 18, 2019, a U.S. Postal Inspector reviewed USPS records for 12 packages that were collected from the collection box at the Franklin Farm Shopping Center. All 12 of the parcels contained the sender name "RAISON EXPRESS" with a return address in Fairfax County, Virginia. Investigators believe that these 12 packages were likely deposited by HON

21

LAM LUK when he was observed in the Franklin Farm Shopping Center in the late evening on October 17, 2019.

51.     During the afternoon on October 18, 2019, investigators observed LIEN KIM THI PHAN, HON LAM LUK and DUONG THUY NGUYEN eat a meal together at a restaurant in Chantilly, Virginia.

52.     I reviewed the data collected from the GPS device that was installed on the **SUBJECT VEHICLE** for October 22 and 23, 2019. On October 22, 2019, at approximately 5:43 PM, the **SUBJECT VEHICLE** arrived in the vicinity of **SUBJECT PREMISES #1**.   At approximately 9:14 PM, the **SUBJECT VEHICLE** departed the vicinity of **SUBJECT PREMISES #1** and arrived in the vicinity of the USPS collection box at the Franklin Farm Shopping Center at approximately 9:28 PM.   The **SUBJECT VEHICLE** then arrived in the vicinity of the Chantilly Post Office at approximately 9:38 PM.   The **SUBJECT VEHICLE** then arrived in the vicinity of **SUBJECT PREMISES #1** at approximately 9:48 PM.   The **SUBJECT VEHICLE** departed from the vicinity of **SUBJECT PREMISES #1** at approximately 12:18 AM on October 23, 2019 and it arrived in the vicinity of **SUBJECT PREMISES #2** at approximately 12:24 AM.

53.     Additionally on October 23, 2019, a U.S. Postal Inspector reviewed USPS records for 48 packages that were collected from the collection boxes at the Chantilly Post Office, the Greenbriar Town Center and the Franklin Farm Shopping Center.   All 48 of the parcels contained the sender name "RAISON EXPRESS" with a return address in Fairfax County, Virginia.

54.     I reviewed the data collected from the GPS device that was installed on the **SUBJECT VEHICLE** for October 24 and 25, 2019.   At approximately 7:35 PM on October 24, 2019, the vehicle arrived in the vicinity of **SUBJECT PREMISES #1**.   At approximately 11:35

PM, the vehicle departed from **SUBJECT PREMISES #1** and arrived in the vicinity of **SUBJECT PREMISES #2** at approximately 11:41 PM. At approximately 12:50 AM on October 25, 2019, the vehicle departed from **SUBJECT PREMISES #2** and arrived in the vicinity of the Post Office located on Westfields Boulevard in Centreville, Virginia at approximately 12:58 AM. The vehicle then arrived in the vicinity of the Chantilly Post Office at approximately 1:02 AM before it arrived in the vicinity of **SUBJECT PREMISES #2** at approximately 1:10 AM on October 25, 2019.

55.     Additionally, during the morning of October 25, 2019, a U.S. Postal Inspector reviewed the items from the Chantilly Collection Box. The inspector observed that there were five USPS First Class parcels and all of them had the return name of "RAISON EXPRESS" and a return address in Fairfax County, Virginia.

56.     On October 29, 2019, HON LAM LUK was observed at Washington Dulles Airport as he boarded a flight to Dubai, United Arab Emirates. Flight records indicated that HON LAM LUK then flew from Dubai to Vietnam.

57.     On December 3, 2019, investigators received information from a government agency that HON LAM LUK had returned to the United States.

58.     On December 4, 2019, investigators observed the **SUBJECT VEHICLE** parked at **SUBJECT PREMISES #2**. Approximately 41 minutes later, the **SUBJECT VEHICLE** pulled alongside the Chantilly Collection Box and HON LAM LUK deposited multiple gray envelopes with white labels and manila envelopes into the Chantilly Collection Box. HON LAM LUK curled his fingers and had the envelopes in between his knuckles when he deposited the gray envelopes.

59.     Additionally, on December 4, 2019, an investigator reviewed the items from the Chantilly Collection Box at the Chantilly Post Office. The investigator observed that there were

13 USPS First Class parcels and all of them had the return name of "RAISON EXPRESS." Therefore, I believe that the packages observed by the investigator from the collection box were the envelopes that HON LAM LUK deposited earlier on December 4, 2019.

**Physical Surveillance of DUONG THUY NGUYEN and the SUBJECT VEHICLE**

60.     On October 30, 2019, investigators observed a gray Nissan Rogue pull alongside the Chantilly Collection Box. Virginia DMV records indicated that the Nissan was registered to an individual believed to be HON LAM LUK's father at **SUBJECT PREMISES #2**. DUONG THUY NGUYEN drove the Nissan and there was a child in the back seat. Investigators observed DUONG THUY NGUYEN deposit multiple manila envelopes with white labels and multiple gray envelopes into the Chantilly Collection Box. DUONG THUY NGUYEN curled her fingers and had the envelopes in between her knuckles as she deposited them into the box. I believe that this was an attempt by DUONG THUY NGUYEN to avoid leaving fingerprints on the envelope. Approximately nine hours later, the Nissan Rogue was observed parked in front of **SUBJECT PREMISES #1.**

61.     Additionally, on October 30, 2019, a U.S. Postal Inspector reviewed the items from the Chantilly Collection Box. The inspector observed that there were nine USPS First Class parcels and all of them had the return name of "RAISON EXPRESS" and a return address in Fairfax County, Virginia. Four of the parcels were in manila padded envelopes and five of the parcels were in gray padded envelopes. Therefore, I believe that the nine packages observed by USPIS were likely the same envelopes that investigators observed DUONG THUY NGUYEN deposit earlier on October 30, 2019.

62.     On November 1, 2019, investigators observed DUONG THUY NGUYEN drive the gray Nissan Rogue and pull alongside the Chantilly Collection Box. DUONG THUY

NGUYEN deposited multiple items to include multiple manila envelopes and multiple gray envelopes into the Chantilly Collection Box. DUONG THUY NGUYEN again curled her fingers and had the envelopes in between her knuckles as she deposited some of the items into the box. I believe that this was an attempt by DUONG THUY NGUYEN to avoid leaving fingerprints on the envelope.

63.     Additionally, on November 1, 2019, a U.S. Postal Inspector reviewed the items from the collection box at the Chantilly Post Office. The inspector observed that there were 11 USPS First Class parcels and all of them had the return name of "RAISON EXPRESS" and a return address in Fairfax County, Virginia. Nine of the parcels were in manila padded envelopes and two of the parcels were in gray padded envelopes. Therefore, I believe that the 11 packages observed by USPIS were likely the same envelopes that investigators observed DUONG THUY NGUYEN deposit earlier on November 1, 2019.

64.     On November 5, 2019, investigators observed DUONG THUY NGUYEN enter the **SUBJECT VEHICLE** which was parked at the Hylton Performing Arts Center in Manassas, Virginia. NGUYEN appeared to have attended a naturalization ceremony at the center and she departed in the vehicle by herself. Investigators believe that DUONG THUY NGUYEN operated the vehicle because HON LAM LUK was out of the country.

65.     On November 6, 2019, investigators observed the **SUBJECT VEHICLE** pull alongside the Chantilly Collection Box. DUONG THUY NGUYEN drove the **SUBJECT VEHICLE** and there was a child in the back seat. DUONG THUY NGUYEN wore gloves as she deposited multiple gray envelopes into the Chantilly Collection Box. I believe that this was an attempt by DUONG THUY NGUYEN to avoid leaving fingerprints on the envelopes.

25

66.     Additionally, on November 6, 2019, a U.S. Postal Inspector reviewed the items from the collection box at the Chantilly Post Office. The inspector observed that there were 12 USPS First Class parcels in gray padded envelopes and all of them had the return name of "RAISON EXPRESS" and a return address in Fairfax County, Virginia. Therefore, I believe that the 12 packages observed by USPIS were likely the same envelopes that investigators observed DUONG THUY NGUYEN deposit earlier on November 6, 2019.

67.     On November 15, 2019, investigators observed DUONG THUY NGUYEN driving the **SUBJECT VEHICLE** and she pulled alongside the Chantilly Collection Box. DUONG THUY NGUYEN wore a glove on her left hand as she deposited multiple gray envelopes into the Chantilly Collection Box and she guided them into the collection box with her bare right hand closed in a fist. She then deposited multiple manila envelopes with her bare right hand. I believe that this was an attempt by DUONG THUY NGUYEN to avoid leaving fingerprints on the gray envelopes, unlike the manila envelopes which are not suspected of being drug laden packages. DUONG THUY NGUYEN then parked the **SUBJECT VEHICLE** and walked toward the Post Office. DUONG THUY NGUYEN re-entered the vehicle a few minutes later and departed the area.

68.     Additionally, on November 15, 2019, a U.S. Postal Inspector reviewed the items from the collection box at the Chantilly Post Office. The inspector observed that there were nine USPS First Class parcels in gray padded envelopes and all of them had the return name of "RAISON EXPRESS" and a return address in Fairfax County, Virginia. There were three manila envelopes in the collection box where the return name was "DUONG NGUYEN." Therefore, I believe that the 12 packages observed by USPIS were likely the same envelopes that investigators observed DUONG THUY NGUYEN deposit earlier on November 15, 2019.

26

69.   Investigators chose one of the gray padded envelopes from the collection box and several other random parcels from the Chantilly Post Office.  The gray padded envelope was addressed to a residence in California and the return name on the envelope was "RAISON EXPRESS."  The parcels were spread out in an area outside of the Chantilly Post Office and a drug detecting K-9 alerted on the gray padded envelope from the Chantilly Collection Box for the presence of narcotics.  A search warrant was issued by United States Magistrate Judge Michael Nachmanoff on November 18, 2019.  Upon opening the package, investigators observed 30 peach colored tablets in a re-sealable clear plastic baggie which was inside a black foil bag.  There was a white piece of paper folded over the black foil bag and the number "30" was written on the paper. It is noted that the contents of the package were similar to those received in all of the undercover purchases from addy4cheap.

70.   On November 18, 2019, investigators observed DUONG THUY NGUYEN and a small child depart from **SUBJECT PREMISES #2** in the **SUBJECT VEHICLE**.  DUONG THUY NGUYEN carried a blue bag over her shoulder and she pulled a white plastic bag out of the trunk of the vehicle.   There appeared to be manila colored items in the white bag. Approximately eight minutes later, DUONG THUY NGUYEN pulled alongside the Chantilly Collection Box.  DUONG THUY NGUYEN wore a glove on her left hand as she deposited multiple manila envelopes into the Chantilly Collection Box and she guided them into the collection box with her bare right hand closed in a fist.  Investigators observed DUONG THUY NGUYEN holding the blue bag in her right hand as she deposited some of the manila envelopes.

71.   Additionally on November 18, 2019, a U.S. Postal Inspector reviewed USPS records for 10 packages that bore a return name of "RAISON EXPRESS" with a Fairfax County, Virginia return address.  These 10 packages had been deposited into the Chantilly Collection Box

27

on November 18, 2019, which is the same Chantilly Collection Box where investigators observed DUONG THUY NGUYEN deposit manila envelopes on November 18, 2019. Therefore, I believe that the 10 packages reviewed by USPIS were likely the same manila envelopes that investigators observed DUONG THUY NGUYEN deposit earlier on November 18, 2019.

72.     On November 19, 2019, investigators observed DUONG THUY NGUYEN driving the **SUBJECT VEHICLE** and she pulled alongside the Chantilly Collection Box.  DUONG THUY NGUYEN wore gloves as she deposited multiple manila envelopes into the Chantilly Collection Box.  DUONG THUY NGUYEN then parked and entered the Chantilly Post Office without gloves on her hands.

73.     Additionally, on November 19, 2019, a U.S. Postal Inspector reviewed the items from the collection box at the Chantilly Post Office.  The inspector observed that there were 10 USPS First Class parcels and all of them had the return name of "RAISON EXPRESS" and a return address in Fairfax County, Virginia.  Therefore, I believe that the 10 packages observed by USPIS were likely the same envelopes that investigators observed DUONG THUY NGUYEN deposit earlier on November 1, 2019.

74.     On November 20, 2019, investigators observed DUONG THUY NGUYEN driving the **SUBJECT VEHICLE** and she pulled alongside the Chantilly Collection Box.  DUONG THUY NGUYEN deposited multiple gray envelopes into the collection box while wearing gloves.

75.     Additionally, on November 20, 2019, a U.S. Postal Inspector reviewed the items from the collection box at the Chantilly Post Office.  The inspector observed that there were 13 USPS First Class parcels and all of them had the return name of "RAISON EXPRESS" and a return address in Fairfax County, Virginia.  Therefore, I believe that the 13 packages observed by

USPIS were likely the same envelopes that investigators observed DUONG THUY NGUYEN deposit earlier on November 20, 2019.

76.     On November 22, 2019, investigators observed DUONG THUY NGUYEN driving the **SUBJECT VEHICLE** and she pulled alongside the Chantilly Collection Box.  DUONG THUY NGUYEN wore gloves as she deposited multiple gray envelopes into the Chantilly Collection Box.

77.     Additionally, on November 22, 2019, a U.S. Postal Inspector reviewed the items from the collection box at the Chantilly Post Office.  The inspector observed that there were 19 USPS First Class parcels and all of them had the return name of "RAISON EXPRESS" and a return address in Fairfax County, Virginia.  Therefore, I believe that the 19 packages observed by USPIS were likely the same envelopes that investigators observed DUONG THUY NGUYEN deposit earlier on November 22, 2019.

78.     Also on November 22, 2019, United States Magistrate Judge Michael Nachmanoff authorized an extension of the GPS tracking warrant for the device installed on the **SUBJECT VEHICLE.**

79.     On November 25, 2019, investigators observed DUONG THUY NGUYEN driving the **SUBJECT VEHICLE** and she pulled alongside the Chantilly Collection Box.  DUONG THUY NGUYEN wore gloves as she deposited multiple gray and manila envelopes into the Chantilly Collection Box.  As DUONG THUY NGUYEN drove away from the Post Office, it was observed that she did not have gloves on her hands any longer.

80.     Additionally, on November 25, 2019, a U.S. Postal Inspector reviewed the items from the collection box at the Chantilly Post Office.  The inspector observed that there were 19 USPS First Class parcels and all of them had the return name of "RAISON EXPRESS" and a

return address in Fairfax County, Virginia. One of the 19 packages was intended for the undercover investigator who had placed an order on November 21, 2019 with addy4cheap as detailed in the table above. Therefore, I believe that the 19 packages observed by USPIS were likely the same envelopes that investigators observed DUONG THUY NGUYEN deposit earlier on November 25, 2019.

81. I reviewed the data collected from the GPS tracking device that was installed on the **SUBJECT VEHICLE** for November 27 and 28, 2019. At approximately 7:10 PM on November 27, 2019, the vehicle arrived in the vicinity of **SUBJECT PREMISES #1**. At approximately 3:31 AM on November 28, 2019, the **SUBJECT VEHICLE** departed from **SUBJECT PREMISES #1**.

82. On December 2, 2019, investigators observed DUONG THUY NGUYEN driving the **SUBJECT VEHICLE** with a small child in the back seat as she pulled alongside the Chantilly Collection Box. DUONG THUY NGUYEN wore gloves as she deposited multiple manila envelopes into the Chantilly Collection Box.

83. Additionally, on December 2, 2019, a U.S. Postal Inspector reviewed the items from the Chantilly Collection Box at the Chantilly Post Office. The inspector observed that there were 19 USPS First Class parcels and all of them had the return name of "RAISON EXPRESS" and a return address in Fairfax County, Virginia. Therefore, I believe that the 19 packages observed by USPIS were likely the same envelopes that investigators observed DUONG THUY NGUYEN deposit earlier on December 2, 2019.

**Video Surveillance and Digital Photographs**

84. A video surveillance camera was positioned on the Chantilly Collection Box for a significant portion of the investigation. In addition to the previously detailed deposits made into

the Chantilly Collection Box, investigators reviewed video recordings of additional deposits of suspected addy4cheap packages. The white Scion was observed at the Chantilly Collection Box on September 12 and 24, 2019 and the driver deposited multiple envelopes. The **SUBJECT VEHICLE** was observed at the Chantilly Collection Box on September 25 and October 15, 25 and 26, 2019 and the driver deposited multiple envelopes. The gray Nissan Rogue was observed at the Chantilly Collection Box on October 29, 2019 and the driver deposited multiple envelopes.

85.     It is noted that investigators took digital photos for all of the physical surveillance events detailed in this affidavit except for the surveillance on October 17, 2019.

### Background on Bitcoin

86.     As discussed above, investigators made purchases on the Empire Market and Cryptonia from addy4cheap using bitcoin obtained with official government funds.

87.     Bitcoin is a type of virtual currency, circulated over the Internet. Bitcoin are not issued by any government, bank, or company, but rather are controlled through computer software operating via a decentralized, peer-to-peer network. Bitcoin is just one of many varieties of virtual currency.

88.     Bitcoin are sent to and received from Bitcoin "addresses." A Bitcoin address is somewhat analogous to a bank account number and is represented as a 26-to-35-character-long case-sensitive string of letters and numbers. Each Bitcoin address is controlled through the use of a unique corresponding private key. This key is the equivalent of a password, or PIN, and is necessary to access the funds associated with a Bitcoin address. Only the holder of an address' private key can authorize transfers of bitcoin from that address to other Bitcoin addresses. Users can operate multiple Bitcoin addresses at any given time and may use a unique Bitcoin address for each and every transaction.

31

89.     To acquire bitcoin, a typical user purchases them from a virtual currency exchange. A virtual currency exchange is a business that allows customers to trade virtual currencies for other forms of value, such as conventional fiat money (*e.g.*, U.S. dollars, Russian rubles, euros). Exchanges can be brick-and-mortar businesses (exchanging traditional payment methods and virtual currencies) or online businesses (exchanging electronically transferred money and virtual currencies). Virtual currency exchanges doing business in the United States are regulated under the Bank Secrecy Act and must collect identifying information about their customers and verify their clients' identities.

90.     To transfer bitcoin to another Bitcoin address, the sender transmits a transaction announcement, which is electronically signed with the sender's private key, across the peer-to-peer Bitcoin network. To complete a transaction, a sender needs only the Bitcoin address of the receiving party and the sender's own private key. This information on its own rarely reflects any identifying information about either the sender or the recipient. As a result, little-to-no personally identifiable information about the sender or recipient is transmitted in a Bitcoin transaction itself. Once the sender's transaction announcement is verified by the network, the transaction is added to the blockchain, a decentralized public ledger that records every Bitcoin transaction. The blockchain logs every Bitcoin address that has ever received bitcoin and maintains records of every transaction for each Bitcoin address.

91.     While a Bitcoin address owner's identity is generally anonymous within the blockchain (unless the owner opts to make information about the owner's Bitcoin address publicly available), investigators can use the blockchain to identify the owner of a particular Bitcoin address. Because the blockchain serves as a searchable public ledger of every Bitcoin transaction, investigators can trace transactions to, among other recipients, Bitcoin exchangers. Because

Bitcoin exchangers generally collect identifying information about their customers, as discussed above, subpoenas or other appropriate legal process submitted to exchangers can, in some instances, reveal the true identity of an individual responsible for a Bitcoin transaction.

## Computers, Electronic Storage, and Forensic Analysis

92. As described above and in Attachment B, the search warrants applied for seek permission to search for records that might be found in the **SUBJECT PROPERTIES**, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the search warrants applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Federal Rule of Criminal Procedure 41(e)(2)(B).

93. *Technical Terms.* Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I use the following technical terms to convey the following meanings or characteristics:

a. **Digital device**: A digital device as used herein, includes the following three terms and their respective definitions:

1) *Computer*: A computer is an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device. *See* 18 U.S.C. § 1030(e)(1). Computers are physical units of equipment that perform information processing using a binary system to represent information. Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

2)     *Digital storage media*:  Digital storage media is any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices.   Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

3)     *Computer hardware*: Computer hardware is all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

b.     *IP Address*: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

c.     *Internet*: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections

34

between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

      d.     ***Storage medium***: A storage medium is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

      e.     ***Computer software:*** Computer software is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

      f.     ***Cache:*** Cache is the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website in the future.

      g.     ***Encryption***: Encryption is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can. In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext. This is usually done with the use of an encryption key, which specifies how the message is to be encoded. Any unintended party that can see the ciphertext should not be able to determine anything about the original message. An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

    94.    ***Probable cause.*** I submit that if a digital device or storage medium is found in the **SUBJECT PROPERTIES**, there is probable cause to believe that evidence, fruits, or contraband will be stored on that digital device or storage medium, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

95. *Forensic evidence.* As further described in Attachment B, the search warrants applied for seek permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes

36

how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the **SUBJECT PROPERTIES** because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f.      I know that when an individual uses a computer to act as a vendor on a DM, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was

39

achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

96.     *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a.     **The time required for an examination**. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the search warrants call for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the search warrants can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.     **Technical requirements**. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the

search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.     **Variety of forms of electronic media.** Records sought under the search warrants could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

### Methods to Be Used to Search Digital Devices

97.     Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.     Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today. Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.     Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific

41

procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

      c.      Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

      d.      Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby

42

thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches. Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format. Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

e. Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software. The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device. Additionally, most smart phones and other mobile devices require passwords for access. For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode. Newer cell phones

43

employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer. Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many. For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

      f.     Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to these warrants may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices. In light of these difficulties, I request permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of these search warrants.

      98.     In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

      a.     The digital devices, and/or any digital images thereof created by law enforcement, sometimes with the aid of a technical expert, in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

44

b.       The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

c.       In searching the digital devices, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B. In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B. Any search techniques or protocols used in searching the contents of the device(s) will be specifically chosen to identify the specific items to be seized under the search warrants.

99.       Based on the foregoing, and consistent with Federal Rule of Criminal Procedure 41(e)(2)(B), the search warrants applied for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted

scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

### Locked Devices With Touch ID and Face ID

100.    In my training and experience, it is likely that the **SUBJECT PROPERTIES** will contain at least one Apple brand device, such as an iPhone or iPad because at least DUONG THUY NGUYEN has been seen using an Apple iPhone.  I know from my training and experience, as well as from information found in publicly available materials including those published by Apple, that some models of Apple devices such as iPhones and iPads offer their users the ability to unlock the device via the use of a fingerprint or thumbprint (collectively, "fingerprint") in lieu of a numeric or alphanumeric passcode or password.  This feature is called Touch ID.

90.    If a user enables Touch ID on a given Apple device, he or she can register up to 5 fingerprints that can be used to unlock that device.  The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) found at the bottom center of the front of the device.  In my training and experience, users of Apple devices that offer Touch ID often enable it because it is considered to be a more convenient way to unlock the device than by entering a numeric or alphanumeric passcode or password, as well as a more secure way to protect the device's contents. This is particularly true when the user(s) of the device are engaged in criminal activities and thus have a heightened concern about securing the contents of the device.

91.    In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode or password must be used instead.  These circumstances include: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours *and* the passcode or password has not

46

been entered in the last 6 days. Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time. Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; and (3) five unsuccessful attempts to unlock the device via Touch ID are made.

92.     The passcode or password that would unlock any Apple device(s) found during the searches of the **SUBJECT PROPERTIES** is not known to law enforcement. Thus, it will likely be necessary to press the finger(s) of the user(s) of any Apple device(s) found during the searches of the **SUBJECT PROPERTIES** to the device's Touch ID sensor in an attempt to unlock the device for the purpose of executing the search authorized by the search warrants. Attempting to unlock any Apple device(s) via Touch ID with the use of the fingerprints of the user(s) is necessary because the government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by the search warrants.

93.     In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose fingerprints are among those that will unlock the device via Touch ID, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any occupants or owners of the **SUBJECT PROPERTIES** to press their finger(s) against the Touch ID sensor of the locked

47

Apple device(s) found during the search of the Subject Premises in order to attempt to identify the device's user(s) and unlock the device(s) via Touch ID.

94.    Although I do not know which of a given user's 10 fingerprints is capable of unlocking a particular device, based on my training and experience I know that it is common for a user to unlock a Touch ID-enabled Apple device via the fingerprints on thumbs or index fingers. In the event that law enforcement is unable to unlock any Apple device(s) found in the **SUBJECT PROPERTIES** as described above within the five attempts permitted by Touch ID, this will simply result in the device requiring the entry of a password or passcode before it can be unlocked.

95.    Due to the foregoing, I request that the Court authorize law enforcement to press the fingers (including thumbs) of individuals found at or in the **SUBJECT PROPERTIES** to the Touch ID sensor of any Apple brand device(s), such as an iPhone or iPad, found at or in the **SUBJECT PROPERTIES** for the purpose of attempting to unlock the device via Touch ID in order to search the contents as authorized by the search warrants.

96.    Apple also equips its iPhone X, which was released in fall 2017, with a facial-recognition feature that enables users to unlock the device with their faces. To activate the facial-recognition feature, a user must hold the device in front of his or her face. The device's camera analyzes and records data based on the user's facial characteristics. The device is then automatically unlocked if the camera detects a face with characteristics that match those of the registered face. No physical contact by the user with the digital device is necessary for the unlocking of the phone, but eye contact with the camera is often essential to the proper functioning of these facial-recognition features; thus, a user must have his or her eyes open during the biometric scan (unless the user previously disabled this requirement). Other companies produce digital devices equipped with a facial-recognition-unlock feature, and all work in a similar manner with

different degrees of sophistication, *e.g.*, Samsung's Galaxy S8 (released Spring 2017) and Note8 (released Fall 2017). Apple calls its facial-recognition unlock feature "Face ID." The scan and unlock process for Face ID is almost instantaneous, occurring in approximately one second.

97.    While not as prolific on digital devices as fingerprint and facial-recognition features, both iris and retina-scanning features exist for securing devices/data. The human iris, like a fingerprint, contains complex patterns that are unique and stable. Iris-recognition technology uses mathematical pattern-recognition techniques to map the iris using infrared light. Similarly, retina scanning casts infrared light into a person's eye to map the unique variations of a person's retinal blood vessels. A user can register one or both eyes to be used to unlock a device with these features. To activate the feature, the user holds the device in front of his or her face while the device directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data from the person's eyes. The device is then unlocked if the camera detects the registered eye.

98.    In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered a more convenient way to unlock a device than entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered a more secure way to protect a device's contents.

99.    I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features have been enabled. This can occur when a device has been restarted or inactive, or has not been unlocked for a certain period of time. For example, with Apple's biometric unlock features, these circumstances include when: (1) more than 48 hours has passed since the last time the device was unlocked; (2) the device

49

has not been unlocked via Touch ID or Face ID in eight hours and the passcode or password has not been entered in the last six days; (3) the device has been turned off or restarted; (4) the device has received a remote lock command; (5) five unsuccessful attempts to unlock the device via Touch ID or Face ID are made; or (6) the user has activated "SOS" mode by rapidly clicking the right side button five times or pressing and holding both the side button and either volume button. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

100. Due to the foregoing, I request that the Court authorize law enforcement pursuant to the applied for search warrants to hold the seized digital devices in front of the face of individuals found at or in the **SUBJECT PROPERTIES** with the individuals' eyes open to activate the facial-, iris-, and/or retina-recognition feature for the purpose of attempting to unlock the digital devices in order to search the contents as authorized by the applied for search warrants.

101. Because several people share as a residence both **SUBJECT PREMISES #1** and **SUBJECT PREMISES #2**, it is possible that **SUBJECT PREMISES #1** and **SUBJECT PREMISES #2** will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that that it is possible that the things described in the search warrants could be found on any of those computers or storage media, the search warrants applied for would permit the seizure and review of those items as well.

### Conclusion

102. Based on the information provided in this affidavit, probable cause exists to believe that items and records, which are evidence of violations of Title 21, United States Code, Sections 841(a)(1), 843, and 846 are currently contained in the **SUBJECT PROPERTIES**. The items and

records to be seized are more particularly described in Attachment B.  Wherefore, pursuant to Rule 41 of the Federal Rules of Criminal Procedure, I respectfully request warrants to search the **SUBJECT PROPERTIES** as described in Attachments A-1, A-2, and A-3 and to seize those items identified in Attachment B.


_____

Donald August Mockenhaupt
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
on the 6th day of December 2019.


_____ /s/ _____
Ivan D. Davis
United States Magistrate Judge

51

## ATTACHMENT A-1

*Property to be Searched*

The premises to be searched is the following, including any and all structures and/or vehicles located within the curtilage thereof: 13109 Pennypacker Lane, Fairfax, Virginia 22033, within the county of Fairfax. The nearest cross street is Pageant Lane. The property is a multi-level single family home. There is an overhang over the front door and the numbers "13109" are displayed horizontally on the overhang and above the front door. The overhang is supported by white pillars. The structure consists of yellow siding and it has white window frames with brown shutters. The driveway is to the left of the front door but there is no garage at the end of the driveway.



## ATTACHMENT A-2

*Property to be Searched*

The premises to be searched is the following, including any and all structures and/or vehicles located within the curtilage thereof:  13514 Tabscott Drive, Chantilly, Virginia 20151, within the county of Fairfax.  The nearest cross street is Curry Place.  The property is a multi-level single family home.  There is an overhang over the front door that is supported by white pillars.  The numbers "13514" are displayed diagonally to the right of the front door.   The front door is brown and there is a weather door constructed primarily of glass.  The home consists of red brick and white siding.  The driveway is to the left of the front door and it leads to a one car garage.  There is a mailbox on a white post in front of the residence with the numbers "13514" affixed horizontally.  There is a white shed in the backyard.



## ATTACHMENT A-3

*Property to be Searched*

A 2014 gray Mercedes Benz CLA 250 bearing Virginia license plate number VRP9225 and vehicle identification number WDDSJ4EB7EN124502 registered to Hon Lam Luk and an individual believed to be his father at 13514 Tabscott Drive, Chantilly, Virginia 20151.



**ATTACHMENT B**

*Property to be Seized*

1.  The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 21, United States Code, Sections 841, 843 and 846 (distribution and possession with intent to distribute, and conspiracy to distribute and possess with intent to distribute, controlled substances, including by means of the Internet, and illegal use of the mail):

      a.  Controlled substances, in particular Adderall and methamphetamine;

      b.  Items commonly associated with the packaging and sales of controlled substances, including USPS packaging, sealed parcels prepared for mailing, gray and manila bubble mailers, address labels, black foil bags, raisin boxes, plastic bags or zip lock bags;

      c.  Photographs and/or video, in particular photographs and/or videotapes of potential co-conspirators and their criminal associates, assets, and/or controlled substances, along with personal address lists, and other documents with the names and telephone numbers of potential co-conspirators;

      d.  Records, correspondence, narcotic customers lists, narcotic suppliers lists, ledgers, logs, journals, accounts payable and receivable, pay-owe sheets, contracts, letters and memoranda of agreements between potential coconspirators, formulas, receipts, phone records, phone books, address books, notations and other papers, and any files relating to the transporting, ordering, purchasing, or distributing of controlled substances;

      e.  Records relating to the use of and accumulation of proceeds derived from the sale of Adderall and methamphetamine or any other illegal controlled substances, as well as the acquisition of property obtained from drug proceeds, and items evidencing the obtaining, secreting, transfer, concealment, and/or expenditure of money obtained from drug sales, including records of large purchases, receipts, canceled checks, bank records, credit card records, wire transfers, wire transfer receipts, cashier's checks, cashier's check receipts, addressed mail, express delivery receipts/envelopes, utility company receipts, rent receipts, income tax returns, money drafts, money orders, and their receipts;

      f.  Financial records including expenses incurred in obtaining the equipment and items necessary for the transportation and/or distribution of controlled substances, income derived from the sales of controlled substances, as well as records of legitimate income or lack thereof, and general living expenses;

      g.  United States currency in excess of $1,000, cryptocurrency also known as virtual currency, including bitcoin, stored on electronic or paper wallets or other means, cryptocurrency private keys and recovery seeds, gift cards, cash cards, and records relating to income derived from the transportation, sales, and distribution of controlled

substances and expenditures of money and wealth, for example, money orders, wire transfers, cashier's checks and receipts, passbooks, checkbooks, check registers, securities, precious metals, jewelry, antique or modem automobiles, bank statements and other financial instruments, including stocks or bonds in amounts indicative of the proceeds of illicit controlled substances trafficking;

h. Documents indicating travel in interstate and foreign commerce, such as travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills;

i. Receipts, notes, ledgers, records, programs, and applications relating to Bitcoin and other cryptocurrencies;

j. Records reflecting names, addresses, telephone numbers, internet monikers, and other contact or identification data for others involved in the exchange of bitcoin and other cryptocurrencies;

k. Any digital device used to facilitate the above listed violations and forensic copies thereof;

l. With respect to any digital device used to facilitate the above-listed violations or containing evidence falling within the scope of the categories of items to be seized described herein:

    i.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

    ii.    evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    iii.    evidence of the use of virtual private networks and the TOR network including, but not limited to, access of darknet marketplaces;

    iv.    evidence of the attachment of other devices;

    v.    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

    vi.    evidence of the times the device was used;

    vii.    passwords, encryption keys, PGP keys, recovery seeds, and other access devices that may be necessary to access devices;

> > viii.  applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;
> >
> > ix.  records of or information about Internet Protocol addresses used by the device; and
> >
> > x.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.
>
> m.  Any and all cryptocurrency, to include the following:
>
> > i.  any and all representations of cryptocurrency public keys or addresses, whether in electronic or physical format;
> >
> > ii.  any and all representations of cryptocurrency private keys, whether in electronic or physical format;
> >
> > iii.  any and all representations of cryptocurrency wallets or their constitutive parts, whether in electronic or physical format, to include "recovery seeds" or "root keys" which may be used to regenerate a wallet.

> n.  The United States is authorized to seize any and all cryptocurrency by transferring the full account balance in each wallet to a public cryptocurrency address controlled by the United States.

> n.  The United States is further authorized to copy any wallet files and restore them onto computers controlled by the United States. By restoring the wallets on its own computers, the United States will continue to collect cryptocurrency transferred into the wallets seized as a result of transactions that were not yet completed at the time that the devices were seized.

2.  As used herein, the terms "records," "documents," "programs," "applications," "materials," and "information" include all forms of creation or storage, including in digital form on any digital device and any forensic copies thereof as well as any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

3.  As used herein, the term "computer" is an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in

conjunction with such device. *See* 18 U.S.C. § 1030(e)(1). Computers are physical units of equipment that perform information processing using a binary system to represent information. Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

4. As used herein, the term "storage medium" includes any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices. Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

5. As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

6. For any computer or storage medium whose seizure is otherwise authorized by the search warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER").

   a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

   b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

   c. evidence of the lack of such malicious software;

   d. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

   e. evidence of the use of virtual private networks and the TOR network including, but not limited to, access of darknet marketplaces;

4

f.  evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

g.  evidence indicating the computer user's state of mind as it relates to the crime under investigation;

h.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

i.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

j.  evidence of the times the COMPUTER was used;

k.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

l.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

m. records of or information about Internet Protocol addresses used by the COMPUTER;

n.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

o.  Routers, modems, and network equipment used to connect COMPUTERs to the Internet; and

p.  contextual information necessary to understand the evidence described in this Attachment B.

7.  During the execution of the search of the **SUBJECT PROPERTIES** described in Attachments A-1, A-2, and A-3, law enforcement personnel are authorized to press the fingers (including thumbs) of individuals found at the **SUBJECT PROPERTIES** to the Touch ID sensor of any Apple brand device(s), such as an iPhone or iPad, found at the **SUBJECT PROPERTIES** and to hold the digital devices found at the **SUBJECT PROPERTIES** in front of the face of individuals found at or in the **SUBJECT PROPERTIES** with the individuals' eyes open to activate the facial-, iris-, and/or retina-recognition features for the purpose of attempting to unlock the device via Touch ID, Face ID or similar biometric features in order to search the contents as authorized by this warrant.

8.  The search warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate

evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

9.  Any locked container such as a safe may be searched for the property to be seized set forth herein;

10. If the government identifies seized communications to/from an attorney, the investigative team will discontinue review until a filter team of government attorneys and agents is established.  The filter team will have no previous or future involvement in the investigation of this matter.  The filter team will review all seized communications and segregate communications to/from attorneys, which may or may not be subject to attorney-client privilege.  At no time will the filter team advise the investigative team of the substance of any of the communications to/from attorneys.  The filter team then will provide all communications that do *not* involve an attorney to the investigative team and the investigative team may resume its review.  If the filter team decides that any of the communications to/from attorneys are not actually privileged (*e.g.,* the communication includes a third party or the crime-fraud exception applies), the filter team must obtain a court order before providing these attorney communications to the investigative team.  This investigation is presently covert and the government believes that the subject(s) of the search is not aware of this warrant.